Laurence M. Rosen, Esq. (SBN 219683)
THE ROSEN LAW FIRM, P.A.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Counsel for Plaintiff

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| CAROLINE PARADIS, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | Case No.: |
| Plaintiff, | CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| vs. | JURY TRIAL DEMANDED |
| CARDIOVASCULAR SYSTEMS, INC., DAVID L. MARTIN, and LAURENCE L. BETTERLEY, | |
| Defendants. | |

Plaintiff Caroline Paradis, individually and on behalf of all other persons similarly situated, by her undersigned attorneys, for her complaint against Defendants, alleges the following based upon personal knowledge as to herself and her own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through her attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange

Commission ("SEC") filings, wire and press releases published by and regarding Cardiovascular Systems, Inc. ("CSI" or the "Company"), analysts' reports and advisories about the Company, the action brought on behalf of the United States of America and twenty-seven states ("Qui Tam States") against CSI on July 15, 2013, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants (defined below) who purchased or otherwise acquired CSI securities between September 12, 2011 and January 21, 2016, both dates inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its officers and/or directors.

2.      CSI is a medical technology company that develops, manufactures, and markets devices to treat vascular diseases, such as Peripheral Arterial Disease ("PAD"). The Company sells its products directly to hospitals, doctors, and office-based labs.

3.      Throughout the Class Period, Defendants made materially false and misleading statements as well as failed to disclose material adverse facts about the Company's business, operational, and financial performance. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) CSI distributed illegal kickbacks to health care providers; (2) CSI engaged in the off-label promotion of its medical devices; and (3) CSI violated the Food and Drug Administration's (the "FDA") laws and regulations in connection with its

medical devices. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

4.     On July 15, 2013, an action styled *Thams v. Cardiovascular Systems, Inc.*, Docket No. 3:13-cv-00404 (W.D.N.C Jul 16, 2013) (the "*Qui Tam* Action") was brought by a former CSI sales manager pursuant to the *qui tam* provisions of the Federal Civil False Claims Act, 31 U.S.C. § 3729, *et seq*. and pursuant to the *qui tam* provisions of twenty-seven States.[1] The *Qui Tam* Action is incorporated by reference herein and is attached hereto as Exhibit A.

5.     According to the *Qui Tam* Action, CSI engaged in a fraudulent marketing scheme to maximize its profits through an ongoing pattern of fraud and deception involving illegal kickbacks, off-label promotion, and violations of FDA laws and regulations in connection with its medical devices used for the treatment of PAD. Those devices include CSI's Diamondback 360 device, Predator 360 device, and Stealth 360 device (collectively, the "PAD devices"). CSI markets the PAD devices as treatments for PAD.

6.     According to the *Qui Tam* Action, CSI engaged in a broad, unlawful scheme to increase the sales of its PAD devices in order to obtain a more favorable valuation of its stock to attract new investors. In order to effectuate this fraudulent scheme, beginning at least as early as 2010, CSI engaged in a deliberate pattern of fraud and violating FDA laws and regulations.

7.     CSI executed its scheme primarily through unlawful kickbacks and utilizing its sales force to illegally promote off-label[2] sales and the use of its medical devices in order to obtain reimbursement for non-FDA-approved

---

[1] The *Qui Tam Action* was under seal until July 8, 2015.
[2]  If the drug usage is officially indicated they are "FDA approved" (also called 'labeled') and if it is prescribed or taken outstanding to its applied indications the term "Non-approved" (or 'off-label') is used.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

indications[3].

8.      According to the *Qui Tam* Action, CSI's kickback scheme was designed to, and ultimately did, influence doctors and other medical personnel to use CSI's medical devices. The kickbacks included: (1) "free" all-expense-paid training programs followed by explicit demands by CSI employees that attendees use CSI products on future patients; (2) using reimbursement calculators while selling PAD devices in order to show physicians how they could maximize their financial return by using CSI devices, including for unnecessary procedures; (3) giving "free" product to induce the purchase of other product; (4) using referral channel marketing, through which CSI would reward physicians who used or purchased CSI devices by referring patients to those physicians; (5) giving substantial financial assistance to help physicians open outpatient cardiac catheterization labs ("OBLs"); and (6) giving sham Speaker Bureau payments for high-prescribers and others whom CSI sought to cultivate. CSI's *quid pro quo* kickback strategy was intended to and did induce physicians to use and obtain reimbursement for use of CSI medical devices on patients covered by Medicare, Medicaid, and other government payors.

9.      According to the *Qui Tam* Action, CSI's off-label marketing ("OLM") scheme was designed to and did influence doctors and other medical personnel to use CSI's medical devices for procedures that were not medically necessary or medically reasonable. The OLM included: promotion of CSI's PAD devices for use with a smaller catheter – 4-French – the approval was limited to the larger 6-French catheter; and promotion for use in the areas of the body (e.g., coronaries

---

[3] In medicine, an indication is a valid reason to use a certain test, medication, procedure, or surgery. Indications for medications are regulated by the FDA, and are included in the package insert under the phrase "Indications and Usage".

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

and the arms) and disease states (e.g., chronic total occlusions) for which the devices lacked FDA-approval. CSI's OLM strategy was intended to and did induce physicians to sue and obtain reimbursement for use of CSI medical devices on patients covered by Medicare, Medicaid, and other government payors.

10.     CSI's unlawful kickbacks and off-label promotion involved the unlawful making of false records or statements and/or causing false claims to be submitted for the purpose of obtaining payment or reimbursement for false or fraudulent claims in violation of the Federal Civil False Claims Act, 31 U.S.C. § 3729, *et seq*. (the "False Claims Act") and state analogs of the False Claims Act.

11.     Indeed, on May 9, 2014, CSI received a letter from the U.S. Attorney's Office for the Western District of North Carolina stating that it is investigating the Company to determine whether the Company has violated the False Claims Act, ***resulting in the submission of false claims to federal and state health care programs, including Medicare and Medicaid***.

12.     On this news, shares of CSI fell $1.62 per share or approximately 6% from its previous closing price to close at $27.43 per share on May 12, 2014.

## JURISDICTION AND VENUE

13.     The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

14.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

15.     Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C.   §78aa) and 28 U.S.C. §1391(b) as a significant portion of the Defendants' actions, and the subsequent damages, took place within this District. Additionally, CSI has an office in this District.

16.      In connection with the acts, conduct and other wrongs alleged in this

Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

17.     Plaintiff Caroline Paradis, as set forth in the accompanying Certification, which is incorporated by reference herein, purchased CSI securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

18.     Defendant CSI is a medical technology company that develops, manufactures, and markets devices to treat vascular diseases in the United States of America. The Company is incorporated in Delaware with an office in California in this District. CSI's common stock trades on the NASDAQ under the ticker symbol "CSII".

19.     Defendant David L. Martin ("Martin") has been the President and Chief Executive Officer of CSI since February 2007, and a director since August 2006.

20.     Defendant Laurence L. Betterley has been the Chief Financial Officer of CSI since April 2008.

21.     The Defendants Martin and Betterley are sometimes referred to herein as the "Individual Defendants."

22.     Defendant CSI and the Individual Defendants are referred to herein, collectively, as the "Defendants."

**SUBSTANTIVE ALLEGATIONS**

**BACKGROUND OF REGULATORY FRAMEWORK**

23.     The Anti-Kickback Statute ("AKS") prohibits the payment and receipt of kickbacks in return for either procuring or recommending the

procurement of a good, facility, or item to be paid in whole or in part by a federal healthcare program. 42 U.S.C. § 1320a-7b(b).

24. Compliance with the AKS is a condition of receiving payment from federally-funded healthcare programs, including Medicare, Medicaid, and TRICARE.

25. For example, in order to establish eligibility to receive reimbursement from Medicare, both hospitals and physicians must sign a Provider Agreement that states: "I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the [provider's] compliance with all applicable conditions of participation in Medicare." Hospitals must also submit a Hospital Cost Report along with their claims for reimbursement that states: "if services identified in this report [were] provided or procured through the payment directly or indirectly of a kickback or where otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result," and "certify that I am familiar with the laws and regulations regarding the provisions of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations." Physicians and hospitals that used CSI PAD devices and sought reimbursement for those products and procedures from government-funded health care programs signed and/or certified compliance with these Provider Agreements and/or Hospital Cost Reports.

26. A "claim that includes items or services resulting from a violation of" the AKS "constitutes a false or fraudulent claim for purposes of" the FCA. 42 U.S.C. § 1320a-7b(g).

27. Compliance *vel non* with the AKS is a material requirement that determines whether federally-funded healthcare programs, like Medicare,

7

Medicaid, and TRICARE, will reimburse claims. Essentially, the presence of kickbacks will influence federally-funded healthcare programs' decisions as to whether to pay hospital and physician claims.

28. The Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 *et seq.*, regulates the approval and marketing of medical devices.

29. No medical device may be marketed in the United States without prior approval by the FDA for its intended use. 21 U.S.C. § 360.

30. The FDCA creates three categories of devices that are subject to increasing levels of regulatory oversight: Class I (low risk, general controls), Class II (medium-risk, special controls), and Class III (high-risk, premarket approval). 21 U.S.C. § 360(a)(1).

31. A Class II device – like each of CSI's PAD systems – is a "device which cannot be classified as a class I device because the general controls by themselves are insufficient to provide reasonable assurance of the safety and effectiveness of the device, and for which there is sufficient information to establish special controls to provide such assurance, including the promulgation of performance standards, postmarket surveillance, patient registries, development and dissemination of guidelines (including guidelines for the submission of clinical data in premarket notification submissions in accordance with section 510(k) [21 U.S.C. § 360(k)]), recommendations, and other appropriate actions as the Secretary deems necessary to provide such assurance. For a device that is purported or represented to be for a use in supporting or sustaining human life, the Secretary shall examine and identify the special controls, if any, that are necessary to provide adequate assurance of safety and effectiveness and describe how such controls provide such assurance." 21 U.S.C. § 360c(a)(1)(B).

32. A medical device is approved only for its specific "intended uses" or "the objective intent of the persons legally responsible for the labeling of the

devices." 21 C.F.R. § 801.4.

33. To avoid the costly and time-consuming FDA premarket-approval process, manufacturers of medical devices can seek "510(k)" clearance based upon prior approval of a substantially equivalent device. 21 U.S.C. § 360(k); 21 C.F.R. § 807.87(k).

34. To obtain 510(k) clearance to market a device, the manufacturer must submit a premarket notification, including a certified "statement that the submitter believes, to the best of his or her knowledge, that all data and information submitted in the premarket notification are truthful and accurate and that no material fact has been omitted." 21 C.F.R. § 807.87(k). The notification must include the intended uses of the device, the conditions the device is designed to treat, and the relevant patient population. 21 C.F.R. § 807.92(a)(5).

35. Clearance through the 510(k) process does not constitute FDA "approval" of the device; it limits the cleared use of the device to those indications listed in the 510(k) application as the intended uses. 21 U.S.C. § 352(f); 21 C.F.R. § 801.5; 21 C.F.R. § 807.97. These limited indications must be listed on the label, and a manufacturer may only promote a device for cleared or approve indications. 21 U.S.C. § 352(f); 21 C.F.R. § 807.81(a)(3).

36. Any promotion of a device for any indication not approved or cleared by the FDA and indicated on the label is considered an "off-label" promotion and is unlawful. *See* 21 U.S.C. § 331(d).

37. The Medicare Act only excludes coverage for "any expenses incurred for items or services [which] are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member[.]" 42 U.S.C. § 1395y(a)(1)(A).

38. TRICARE has similar restrictions on reimbursement for off-label use. *See* 32 C.F.R. § 199.4(a)(1)(i) & 2007 TRICARE Policy Manual, ch. 8, §

5.1(III)(B) (excluding coverage for "off-label uses of devices").

39.     CSI's PAD devices are considered medium-risk, Class II devices. These devices were cleared by the FDA for entry into the market through the less-costly and less-comprehensive 510(k) process.

40.     In August 2007, the FDA granted CSI 510(k) clearance for the use of the Diamondback 360 as a therapy in patients with PAD. CSI was granted 510(k) clearance of the Predator 360 in March 2009 and the Stealth 360 in March 2011.

## MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

41.     On September 12, 2011, the Company filed a Form 10-K for the fiscal year ended June 30, 2011 (the "2011 10-K") with the SEC, which provided the Company's year-end financial results and position and stated that the Company's internal control over financial reporting was effective as of June 30, 2011. The 2011 10-K was signed by Defendants Martin and Betterley. The 2011 10-K also contained signed certifications required pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Martin and Betterley, who both certified that:

1.      I have reviewed this annual report on Form 10-K of Cardiovascular Systems, Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

42.     Attached to the 2011 10-K as Exhibit 14.1 was the Company's

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

"**CODE OF ETHICS AND BUSINESS CONDUCT**", which stated in part:

Bribery, kickbacks or other improper or illegal payments have no place in CSI's business.

[P. 5].

\*      \*      \*

**Business Courtesies and Gratuities**

**CSI's policy is not to offer or accept kickbacks or bribes, or gifts of substantial value.**

CSI Representatives may only exchange non-monetary and modestly-valued gifts that promote goodwill with our business partners and do not improperly influence others. We will accept only approved and widely available discounts and do not encourage, accept or exchange gratuities or payments for providing services to others.

Business courtesies such as meals, transportation and entertainment provided to a vendor, supplier, customer or other business associations must be modest in amount and related to a legitimate business purpose (e.g., explanation or demonstration of CSI products, application of products, service capabilities, or training). Such courtesies must not violate the law, regulations, or reasonable customs of the market-place. If you have any question about whether any business courtesies, gratuities or gifts are appropriate, please contact your supervisor or other CSI management. **CSI's SOP for guidance when having interactions with Health Care Professionals or customers because there is a general prohibition on most gifts to Health Care Professionals and customer.**

**CSI's Representatives having relationship with Customers and Health Care Professionals have a separate SOP for guidance as these relationships are highly regulated**

Representatives must deal fairly and honestly with the Company's customers (including potential customers and Health Care Professionals or entities in a position to recommend or influence the purchase or use of Company products) and not take actions that are

11

prohibited by applicable law or ethical standards. The Company intends to follow its own company-established "CSI's Standard Operating Procedures For Interactions With Health Care Professionals" ("SOP") which are largely based upon the standards set forth by AdvaMed in its Code of Ethics on Interactions with Health Care Professionals - Revised and Restated Code of Ethics effective July 1, 2009 which is found at http://www.advamed.org. All Representatives who deal with customers and Health Care Professionals are separately required to read and understand the SOP and sign an acknowledgement related thereto.

The SOP is intended to provide Representatives guidance about appropriate interactions with customers and Health Care Professionals when conducting business within the United States to enable the Company to remain in compliance with the Federal Anti-kickback Statute and Stark Law. Representatives conducting business on behalf of CSI, must also comply with this SOP and these policies apply to any expenditure by CSI Representatives, regardless of whether the expenditure is reimbursed by the Company. In other words, any "personal" money given to or spent for the benefit of a CSI customer is considered money given or spent by the Company.

As used in this Code, and the Guidelines, the term "customer" means any individual or organization that purchases, recommends, uses, or prescribes products manufactured or distributed by CSI or an individual who is in a position to determine whether a CSI product is purchased, recommended, used, or prescribed. This can include physicians, nurses, office administrators, purchasing agents, within hospitals, clinical practices, HMOs, GPOs, etc.

The following general standards and principles should at all times guide our interactions with customers and Health Care Professionals:

- CSI will encourage ethical business practices and socially responsible industry conduct, and will not use any unlawful inducement in order to sell, recommend or arrange the sale, or prescription of its products.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

- At CSI, we believe that enduring customer relationships are based on integrity and trust. We seek to gain advantage over competitors through superior products, research, engineering, manufacturing, marketing and service, never through improper business practices.

- CSI's relationships with customers are intended to benefit patient care and enhance the practice of medicine. Interactions should be focused on informing customers and prospective customers about products, providing scientific and educational information, and supporting medical research and education and should not, at any time, entice representatives of customers to place their own personal interests above those of the organizations they represent or the patients who will use or need the Company's products.

- CSI will not, directly or indirectly, offer or solicit any kind of payments or contributions for the purpose of obtaining, giving, keeping or rewarding business.

**No Payments in exchange for business**

Representatives may not make payments to customers or provide meals, travel expenses, entertainment, gifts, or other benefits to customers or Health Care Professionals in exchange for the customer's agreement to purchase products or services from the Company, or as a reward for the purchase of products or services, nor may Representatives provide benefits to a customer's friends,

relatives, or organizations closely affiliated with the customer in exchange for or as a reward for such business. See **CSI's SOP for guidance when having interactions with Health Care Professionals or customers because any and all entertainment and recreation with Health Care Professionals or customers is prohibited and there is a general prohibition on most gifts.**

[P. 7-8].

43.     On September 10, 2012, the Company filed a Form 10-K for the fiscal year ended June 30, 2012 (the "2012 10-K") with the SEC, which provided the Company's year-end financial results and position and stated that the Company's internal control over financial reporting was effective as of June 30, 2012. The 2012 10-K was signed by Defendants Martin and Betterley. The 2012 10-K contained signed SOX certifications by Defendants Martin and Betterley, substantially similar to the certifications contained in ¶41, *supra.*

44.     On September 11, 2013, the Company filed a Form 10-K for the fiscal year ended June 30, 2013 (the "2013 10-K") with the SEC, which provided the Company's year-end financial results and position and stated that the Company's internal control over financial reporting was effective as of June 30, 2013. The 2013 10-K was signed by Defendants Martin and Betterley. The 2013 10-K contained signed SOX certifications by Defendants Martin and Betterley, substantially similar to the certifications contained in ¶41, *supra.*

45.     The 2013 10-K stated that:

In providing billing and coding information to customers, *we make every effort to ensure that the billing and coding information furnished is accurate and that treating physicians understand that they are responsible for all treatment decisions.*

46.     On August 28, 2014, the Company filed a Form 10-K for the fiscal

year ended June 30, 2014 (the "2014 10-K") with the SEC, which provided the Company's year-end financial results and position and stated that the Company's internal control over financial reporting was effective as of June 30, 2014. The 2014 10-K was signed by Defendants Martin and Betterley. The 2014 10-K contained signed SOX certifications by Defendants Martin and Betterley, substantially similar to the certifications contained in ¶41, *supra*.

47. The 2014 10-K stated that:

In providing billing and coding information to customers, ***we make every effort to ensure that the billing and coding information furnished is accurate and that treating physicians understand that they are responsible for all treatment decisions.***

48. On August 27, 2015, the Company filed a Form 10-K for the fiscal year ended June 30, 2015 (the "2015 10-K") with the SEC, which provided the Company's year-end financial results and position and stated that the Company's internal control over financial reporting was effective as of June 30, 2015. The 2015 10-K was signed by Defendants Martin and Betterley. The 2015 10-K contained signed SOX certifications by Defendants Martin and Betterley, substantially similar to the certifications contained in ¶41, *supra*.

49. The 2015 10-K stated that:

In providing billing and coding information to customers, ***we make every effort to ensure that the billing and coding information furnished is accurate and that treating physicians understand that they are responsible for all treatment decisions.***

50. The statements referenced in ¶41-49 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, products, and directors' backgrounds, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to

disclose that: (1) CSI distributed illegal kickbacks to health care providers; (2) CSI engaged in the off-label promotion of its medical devices; and (3) CSI violated FDA laws and regulations in connection with its medical devices. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

## **TRUTH EMERGES**

51.     On May 9, 2014, during aftermarket hours, CSI filed an 8-K stating that it received a letter from the U.S. Attorney's Office for the Western District of North Carolina stating that it is investigating the Company to determine whether the Company has violated the False Claims Act, ***resulting in the submission of false claims to federal and state health care programs, including Medicare and Medicaid***.

52.     On this news, shares of CSI fell $1.62 per share or approximately 6% from its previous closing price to close at $27.43 per share on May 12, 2014.

53.     On August 5, 2015, CSI held an investor conference call to discuss CSI's Q4 2015 Results and to announce that it is reforming its sales force, and in an exchange with investors, Defendant Martin stated in part:

> **As you're aware we're in the process of expanding our sales force while developing a dual franchise sales organization two big things**. An 18 month plan that began at the beginning of fiscal 2015, once complete we believe this evolution of our organizational position CSI to drive the adoption of our platform technology and marry those two valuable things high growth and sustainable profit. At the end of calendar 2015 our clinically focused sales organization of 250 professionals will have the advantage of selling two high growth, high margin franchises in small span of controlled territories. The small

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS

span of control will allow us to be service intensive and relationship strong in every major domestic market.

54.    The decision to reform CSI's sale force was due in part to the Company's receipt of the letter from the U.S. Attorney's Office for the Western District of North Carolina stating that it is investigating the Company to determine whether the Company has violated the False Claims Act.

55.    On October 7, 2015, CSI disclosed during aftermarket hours that it expects revenue from its 2016 fiscal first quarter to be approximately $43.9 million, well below its previously issued guidance of $48.5 million to $50.0 million, and expects a net loss between $13.1 million to $13.9 million, or $0.41 to $0.43 per common share due to the continued effects of the sales force transition. The Company reported disappointing financial results due to the continued reformation of its sales force, which was a materialization of the Company's receipt of the letter from the U.S. Attorney's Office for the Western District of North Carolina stating that it is investigating the Company to determine whether the Company has violated the False Claims Act.

56.    With respect to these results, Defendant Martin stated:

David L. Martin, CSI's President and Chief Executive Officer, said, "We continued to make progress on our sales optimization strategy to significantly expand our sales organization, while cross training representatives to sell both peripheral and coronary applications. However, as our recent results suggest, some aspects of the transition have been challenging. After a thorough review, we believe we have taken the right steps to address the immediate challenges and continue to expect the vast majority of the optimization effort to be completed by the third quarter of this fiscal year."

57.    On this news, shares of CSI fell $3.01 per share or approximately 18% from its previous closing price to close at $13.62 per share on October 8, 2015 on volume of over 7 million shares.

17

58.    On January 21, 2016, CSI disclosed during aftermarket hours that it expects revenue from its 2016 fiscal second quarter to be $41.4 million, a 4% decrease from the second quarter of fiscal 2015, and 3% below the guidance range due to the continued effects of the sales force transition. Similarly, like the October 7, 2015 financial results, the Company reported disappointing financial results due to the continued reformation of its sales force, which was a materialization of the Company's receipt of the letter from the U.S. Attorney's Office for the Western District of North Carolina stating that it is investigating the Company to determine whether the Company has violated the False Claims Act.

59.    With respect to these results, Scott Ward, CSI's Chairman and Interim President and Chief Executive Officer stated:

> Scott Ward, CSI's Chairman and Interim President and Chief Executive Officer, said, "CSI's sales force expansion and implementation of a dual franchise model, selling both coronary and peripheral applications, has been challenging and is affecting our near term sales performance. We have gained meaningful insights during the transition and we are encouraged by recent progress. The sales organization continues to gain valuable experience and we have begun to adjust our sales model at the local level, adopting a more flexible approach where warranted. We remain confident that our sales strategy will lead to sustainable revenue growth and a pathway to profitability in the future."

60.    On this news, shares of CSI fell $3.72 per share or approximately 30% from its previous closing price to close at $8.74 per share on January 22, 2016 on volume of over 6 million shares.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

61.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired CSI securities traded on NASDAQ during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers

and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

62. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, CSI securities were actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by CSI or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

63. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal law that is complained of herein.

64. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

65. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of CSI;

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

- whether the Individual Defendants caused CSI to issue false and misleading public statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading public statements;

- whether the prices of CSI securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and,

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

66. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

67. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- CSI securities are traded in efficient markets;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on NASDAQ, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

- Plaintiff and members of the Class purchased and/or sold CSI securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

68. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

69. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### Against All Defendants

70. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

71. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

72. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to

defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of CSI securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire CSI securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

73.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for CSI securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about CSI's finances and business prospects.

74.     By virtue of their positions at CSI, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

75.     Information showing that Defendants acted knowingly or with

reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of CSI, the Individual Defendants had knowledge of the details of CSI's internal affairs.

76. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of CSI. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to CSI's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price for CSI's securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning CSI's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired CSI securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged upon the revelation of the alleged corrective disclosures.

77. During the Class Period, CSI's securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of CSI securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them

at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of CSI securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of CSI's securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

78.   By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

79.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating materially false and misleading statements to the investing public.

## COUNT II

**Violation of Section 20(a) of The Exchange Act**
**Against The Individual Defendants**

80.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

81.   During the Class Period, the Individual Defendants participated in the operation and management of CSI, and conducted and participated, directly and indirectly, in the conduct of CSI's business affairs. Because of their senior positions, they knew the adverse non-public information regarding CSI's business practices.

82.   As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information

with respect to CSI's financial condition and results of operations, and to correct promptly any public statements issued by CSI which had become materially false or misleading.

83. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which CSI disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause CSI to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of CSI within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of CSI securities.

84. Each of the Individual Defendants, therefore, acted as a controlling person of CSI. By reason of their senior management positions and/or being directors of CSI, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, CSI to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of CSI and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

85. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by CSI.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post- judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.


Dated: February 12, 2016          Respectfully submitted,


**THE ROSEN LAW FIRM, P.A.**

By:    /s/Laurence M. Rosen
Laurence M. Rosen, Esq. (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Counsel for Plaintiff

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS